**Johnny L. SPAIN et al., Plaintiffs,**

**v.**

**Raymond K. PROCUNIER et al., Defendants.**

**No. C–73–1293 AJZ.**

United States District Court, N. D. California.

Jan. 14, 1976.

As Modified Feb. 10, 1976.

Mark E. Merin, Sacramento, Cal., Fred J. Hiestand, Oakland, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen., Sanford Svetcov, Deputy Atty. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

### INTRODUCTION

Federal jurisdiction is invoked in this case under the provisions of 28 U.S.C. section 1343(3) and 42 U.S.C. section 1983. This action effectively began on December 28, 1973, with the filing of an amended complaint wherein plaintiffs, inmates at the Adjustment Center (hereinafter referred to as "AC"), at the California State Prison at San Quentin alleged that their constitutional rights under the First, Sixth, and Eighth Amendments to the Constitution of the United States have been and continue to be violated.[1] The complaint named as defendants Director of Corrections Raymond K. Procunier, San Quentin Warden Louis Nelson, Associate Warden John Doe Jacobs, and Correctional Officers Campbell, Palmer, and K. E. Thomas. Prior to submission of the case and pursuant to Rule 25(d), Federal Rules of Civil Procedure, the present Director of Corrections, J. J. Enomoto, and the present Warden at San Quentin, R. M. Rees, were added as defendants solely for purposes of injunctive relief. The case was dismissed as to defendants Jacobs and Campbell and as to K. W. Britt, who was named as a defendant while temporarily acting as Warden at San Quentin. The court now dismisses the case as to defendant Palmer since the evidence fails to disclose any activity on his part which justifies his further retention in the case.

Plaintiffs challenge the length and conditions of their confinement and treatment at the AC as well as certain practices of the defendants which allegedly impermissibly interfere with their visitor and mailing privileges and with their rights of access to effective assistance of counsel, access to the courts, and access to the media. Additionally they complain of lack of adequate medical care and attention, lack of an adequate and wholesome diet and other allegedly repressive measures to their physical and emotional detriment.

Following the denial of two motions to dismiss, a motion for summary judgment and a motion to refer the case to a three-judge federal court, all of which were found to be without merit, the parties agreed to defer trial of the damages claims until the conclusion of the trial of the equitable issues. That trial consumed 29 trial days. After briefing of the issues, the case was then submitted to the court.

At the conclusion of the hearing and before briefing, the court indicated that there appeared to be merit in plaintiffs' Eighth Amendment claims of cruel and unusual punishment as they relate to the length and conditions of plaintiffs' segregated confinement and treatment on the first tier of the AC, with its consequent denial of outdoor exercise, and as they relate to the impermissible and dehumanizing restraints applied to plaintiffs for *all* out-of-cell movements. Thereafter the defendants submitted a plan of outdoor exercise for inmates at the AC and indicated that the entire subject of out-of-cell movements and visiting privileges was under review. They agreed to submit progress reports on each of these two matters every 30 days. Eight such

---

1. This amended complaint was filed by counsel substituted for plaintiffs who had theretofore acted in pro per in this action.

reports have been received by the court. On analysis the court finds that these reports not only fail to indicate any improvements in the conditions of confinement and treatment of plaintiffs but also fail to overcome the Eighth Amendment complaints of plaintiffs applicable to all inmates on the first tier of the AC.

It is unfortunate that these issues must be resolved by federal court intervention since the problems presented encompass basic responsibilities in the administration of state prisons which the state legislature, the governor, and duly appointed executive officials of the state are better able and equipped to resolve, given their expertise, their broad and unrestricted powers of inquiry, and their ability through their power of the purse to initiate affirmative action programs. It is obvious that any meaningful and effective resolution of the problems presented will require the appropriation and expenditure of adequate funds for the construction of such new facilities (or the remodeling of such old facilities) and the employment of such added personnel as may be needed not only to meet any constitutional deficiencies in the confinement and treatment of prisoners at the AC at San Quentin but also any that may exist in other facilities throughout the state prison system.[2]

When the state fails to meet its responsibility to make the required "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application," *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), that responsibility becomes the responsibility of a federal district court when proper recourse thereto is made.[3]

With this required mutual accommodation in mind, the court reluctantly, but of necessity, must undertake the formidable task of balancing institutional needs and objectives against the applicable constitutional provisions. In so doing the court must be ever mindful that it is dealing with a "closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so," an environment where "[g]uards and inmates co-exist in direct and intimate contact," where "[t]ension between them is unremitting," and where "[f]rustration, resentment, and despair are commonplace." *Wolff, supra* 418 U.S. at 561, 562, 94 S.Ct. at 2977. It is against this background that the length and conditions of confinement and treatment, disciplinary proceedings, and rules relating to access to counsel, access to the media, mail, visitor, recreational, and other privileges must be structured by prison authorities and evaluated by the court in the accommodation process. The court must be mindful, too, that though the rights of prisoners "may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections. . . . There is no iron curtain drawn between the Constitution and the prisons in this country." *Wolff, supra* 418 U.S. at 555–56, 94 S.Ct. at 2974. With these consid-

---

**2.** The California State Bar Committee on Criminal Justice has recently completed a three-year study of state prison sentencing, the prison system, and prison release procedures, which appears in September/October 1975 issue of the *California State Bar Journal,* Vol. 50 No. 5, wherein at page 361 the Committee reports in part: "Folsom and San Quentin are disgraceful dungeons; Vacaville and Soledad are wholly inadequate places to house human beings. It is clear to the Committee that the physical facilities of these institutions are incompatible with fundamental and minimal standards of decency and humanity."

**3.** "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' [which] includ[es] prisoners." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

"If [the State] is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution . . ." *Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark., 1970).

erations in mind the court now examines the relevant history of plaintiffs, the length and conditions of their confinement and treatment and their rights and privileges at the AC.

## THE EVIDENTIARY HEARINGS

Testifying in support of their entitlement to relief, plaintiffs described how they got to the AC, how they have been treated there, and the effect which such treatment has had on them. Physicians, including the Medical Director of the San Francisco County Jail and the Director of the Security Ward at San Francisco General Hospital, testified in support of plaintiffs' allegations that their health had been adversely affected by the conditions of their confinement.

Two ex-guards who used to work in the AC testified in support of plaintiffs' allegations that guards have beaten, threatened, and harassed plaintiffs and other first tier AC prisoners, that prison reports are at times altered, and that the AC guards have a stereotyped view of plaintiffs and treat them in a dehumanizing fashion.

A professor of pharmacology at Stanford University who is a tear gas expert described the nature and effects of tear gas. A prisoner who had been incarcerated in every portion of San Quentin testified that incarceration in the AC was the most debilitating. Mothers of two of the plaintiffs and two of plaintiffs' lawyers described the visiting difficulties and the effects visiting problems had on plaintiffs, their visitors, and their access to the courts.

Psychiatric and psychological experts testified that AC conditions threaten the sanity of and dehumanize plaintiffs and have already damaged plaintiffs in a way that will only be fully known after they are released.

Through former Director of Corrections Procunier, Wardens Nelson and Britt, correctional officers and staff personnel, physicians and psychiatrists, defendants offered testimony on almost every phase of prison life at the AC, particularly focusing on life on the first tier where plaintiffs have been and continue to be confined. This testimony covered the physical plant of the AC and its cells, noise levels, heating and ventilating, exercise, discipline, use of tear gas, use of restraints, medical care and attention, diet, clothing, hygiene, access to counsel, access to the media, and visitor and mail privileges and procedures. On the Eighth Amendment issues on which the court had expressed particular concern they gave their reasons for the continued confinement of plaintiffs on the first tier of the AC and the use of the heavy restraint equipment employed for all of plaintiffs' out-of-cell movements.

Additionally it should be noted that the court made an unannounced visit and inspection of San Quentin on the eve of the trial. This tour of inspection lasted four hours, with most of the court's time devoted to the AC.

## THE PLAINTIFFS

With the exception of plaintiff Tate, who has been paroled and is presently on bail in the sum of $100,000, the remaining plaintiffs are presently housed in maximum security segregation on the first and most restrictive tier of the AC. They are being confined there pending completion of a trial on an indictment in Marin County Superior Court in which all plaintiffs, including Tate, are charged with first degree murder and other felony offenses.[4] They have been confined

4. Plaintiffs were jointly indicted by the Marin County Grand Jury on October 1, 1971, upon three counts of murder of correctional officers, two counts of murder of other inmates, and one count of conspiracy to escape, kidnap and possess a weapon. They were also indicted in several separate counts charging aggravated assault upon three other officers. The indictment grew out of an incident at San Quentin on August 21, 1971, in which three correctional officers and two inmates were slain. Director Procunier testified that the incident of August 21, 1971, was the worst in his eight years as Director of Corrections.

on this tier in excess of four years with no indication of when they will be released therefrom unless it is sometime after termination of the Marin County trial [5] or upon full expiration of their maximum terms of imprisonment.

Extensive efforts of counsel for plaintiffs to relitigate their original convictions and to minimize or excuse the seriousness of the crimes for which they were incarcerated and to describe plaintiffs as victims of the social and economic ills of our times are irrelevant to these proceedings. The *relevant* fact is that each plaintiff violated the criminal law and has been lawfully incarcerated for doing so. All that the court is now called upon to decide is the constitutionality of the length and conditions of their confinement and treatment at the AC.

*Spain.*

Johnny Spain, now 25 years of age, started serving a life sentence on May 5, 1967, after conviction of first degree murder. In November of 1970, while serving that sentence at Soledad State Prison, he was placed in the Soledad Adjustment Center for approximately six months. That confinement was purportedly based upon his alleged possession of a strike manifesto, but in reality was due to his possession of revolutionary literature (including a piece written by him entitled "Let the White Blood Run") and his manifest militant political and social views. On May 14, 1971, he was transferred to the first tier of the AC at San Quentin despite recommendations in the transfer report which warned that if Spain were "retained in AC setting," prison would "in essence turn him into a long-term segregation case with no possibility of productive program involvement for a prolonged period." This prophetic observation was ignored and after four and one-half years he continues to be confined on the first tier of the AC.

While he had some write-ups for infractions of the prison rules, the primary justification asserted for his continuous confinement on the first tier and, for that matter, the continuous confinement of all plaintiffs, has been the fact that an indictment (now trial) has been pending against all plaintiffs since October 1, 1971. Additional reasons offered for the continuous retention of Spain and all of the plaintiffs include (1) their militant and revolutionary views, (2) their proximity to the court where they were facing and are now on trial, (3) convenience of their counsel, (4) protective custody, and (5) the fact that their counsel throughout all these proceedings have never made a request for their transfer to some other correctional facility. Except to the extent that protective custody might be warranted in the case of Pinell, the court finds these additional assigned reasons to be totally unpersuasive. Protective custody for Pinell may constitute a valid justification for his segregation, provided, of course, that he is given a duly noticed hearing with appropriate due process safeguards before such action is taken.

*Pinell.*

Hugo Pinell, now 31 years of age, started serving a sentence of three years to life in February of 1965 after conviction of forcible rape. Prior to August 21, 1971, he had established a record of violence in prison which included a conviction for manslaughter of a guard at Soledad Prison in 1970, a conviction of aggravated assault on an inmate at Folsom in 1969, and a conviction of aggravated assault on a guard at San Quentin in 1968. Since August of 1971 Pinell has been a frequent offender of prison rules and has been the subject of numerous write-ups concerning serious infractions of these rules. It is probably true that in retaliation against Pinell's conduct, some prison guards have assaulted or

---

**5.** Upon termination of the Marin County trial, whether by conviction, acquittal, or dismissal, the Classification Committee of the Prison must again review all information applicable to plaintiffs and determine appropriate placement for them.

mistreated him. He is described by prison authorities as the most dangerous prisoner at San Quentin. He was transferred to San Quentin and placed on the first tier of the AC in June of 1971 and has been there ever since.

*Drumgo.*

Fleeta Drumgo, now 29 years of age, has been in prison since he was 20 when he was convicted of second degree burglary and sentenced to six months to 15 years in state prison. In February of 1970, while on the main line at Soledad Prison, he and George Jackson and John Clutchette were indicted for the murder of a prison guard. The three defendants were transferred to San Quentin Prison where they were placed on the first tier of the AC. In June, 1970, a venue change was granted moving defendants' trial to San Francisco. On March 27, 1972, Drumgo and his surviving co-defendant were acquitted by a jury. Two weeks later, on April 4, 1972, the AC Review Committee recommended that Drumgo be transferred as soon as possible from the San Quentin AC. However, already indicted in connection with the August 21, 1971, incident, Drumgo was retained in the AC where he remains to this date. Though acquitted at the trial of the murder of the Soledad guard, he was found guilty of that offense by the disciplinary committee. He has a record showing periods of clean time interwoven with a period of unruly and sometimes violent conduct.

*Talamantez.*

Luis Talamantez, now 32 years of age, started serving two consecutive sentences of five years to life in 1965 after conviction of two armed robberies of taxicabs. In March of 1970, after five years at San Quentin, he was placed on the first tier of the AC after being accused of an aggravated assault in a B section altercation. The case was referred to the district attorney and in February of 1972 he was acquitted by the jury. By then, however, he had been indicted for alleged involvement in the events of August 21, 1971, and he has been retained continuously in the AC where he remains today. While the offense of aggravated assault on which he was acquitted could have been considered by the disciplinary and classification committees at properly noticed hearings, apparently this was not done because of the October, 1971, indictment.

*Johnson.*

David Johnson, now 27 years of age, has been in prison since August 5, 1968, when he was convicted of second degree burglary and sentenced to six months to 15 years. He had been previously convicted of battery on a police officer in 1966. On May 6, 1971, after a year and one-half at San Quentin, he was considered for transfer to the less secure facility of Palm Hall, but was denied transfer at that time because a suspected enemy was incarcerated there. Two weeks later he was accused of aggravated assault on a guard and immediately transferred to the first tier of the AC. The disciplinary committee found Johnson guilty. The matter was referred to the district attorney for prosecution and it was not until January, 1974, that Johnson was informed that the district attorney refused to prosecute either for lack of evidence or because Johnson had already been indicted for his alleged connection with the August 21, 1971, escape attempt.

*Tate.*

Until January 14, 1975, Willie Tate, now 29 years of age, had been in prison continuously since the age of 16. While in custody at Deuel Vocational Institute in 1965, he was convicted of assault with a deadly weapon and was sentenced to six months to ten years in prison. As is evident from the above dates, he served his full ten-year term. In 1966 he was transferred from Vacaville to San Quentin where he remained on the main line until February 1969, when he was accused of assaulting another prisoner. When the district attorney refused to prosecute, the prison disciplinary committee found Tate guilty as charged and committed him for a year in segregation

in B section. In 1970 he threw hot or scalding water on defendant Thomas and was thereafter disciplined by confinement for a week in a strip cell followed by 40 days in a quiet cell before being placed in a regular cell on the first tier where he remained continuously until the conclusion of the maximum term to which he was committed. In the course of the hearing in this case he asserted that he threw hot water on Thomas because Thomas harassed him by sexual taunts and homosexual slurs while conducting strip searches and supervising showers. On December 18, 1974, he was transferred to the Marin County Jail where he remained until his bail was posted on January 14, 1974. Because Tate has now been released from prison, the equitable issues here presented are moot as to him. Hence, any relief accorded the other plaintiffs will have no present application to him.

## CELL CONDITIONS

Plaintiffs are confined on the north side of the first tier of the AC.[6] It is a three-story building housing 34 inmates on each floor. While it is the newest and probably the best of San Quentin's antiquated housing facilities and hence presents no serious constitutional problems concerning its physical structure, it nevertheless has become a "hole" for isolated segregation because of the prolonged and restrictive housing conditions and dehumanizing restraints placed upon those who are housed there.

The first floor of the AC has 34 cells, approximately 6 ft. wide, 8 ft. deep, and 9 ft. high[7] in two rows back to back divided by a maintenance alley.[8] Of these cells, 17 on the north side and 11 on the south side are identical in construction and equipment and hereafter will be referred to as regular cells. The six remaining cells are classified by the prison administration as "management" cells.

Each regular cell is occupied by only one inmate and consists of a concrete floor, steel sleeping slab extending from the wall, a sink with hot and cold water, and a seatless toilet. No shelves or cabinets for such items as clothing, books, letters, and other possessions are provided.[9] Each occupant of a cell is provided with one mattress, two sheets, two blankets, and one pillow.

Recessed into the cell's rear wall is a 200 or 250 watt light bulb which can be controlled by the prisoner 24 hours a day. However, these light bulbs are protected by a heavy gauge metal screen and wire-permeated safety glass. The glass has been painted over and materially affects the illuminating power of the light and area of illumination in each

---

6. The AC, which began operation in 1960, was originally conceived as a center for concentrated treatment programs for prisoners confined there. Unfortunately, it never achieved its objective. The report of the Assembly Select Committee on Prison Reform and Rehabilitation, entitled *Administrative Segregation in California Prisons,* better known as the *Karabian Report,* issued in September, 1973, states in part:

> These conditions were never realized. The Department of Corrections not only stumbled in achieving their objective, but fell flat on their face. The adjustment centers have been recognized for what they are . . . . "Segregation and isolation units" (the "hole") were merely relabeled "adjustment centers" with temporary and long-term residents classified into "acute" and "chronic" cases by "adjustment committees." *Id.* at 2–3.

7. By contrast, the general population cells are smaller ($4\frac{1}{2}' \times 11' \times 7\frac{1}{2}'$), are occupied by two inmates, and do not have hot water.

8. Plaintiffs Johnson and Talamantez agree that because the first tier is a closed floor rather than an open tier facility, the noise level on the first tier is probably lower than that found on most other cell blocks. Plaintiffs' expert, Zimbardo, agrees that the regular AC cells are not the physical equivalent of solitary confinement.

9. These cells on the first floor of the AC, like those on the upper floors, formerly were equipped with a small desk and stool and steel storage cabinet with shelves. Prison authorities assert that these furnishings either were destroyed by the inmates or were removed to prevent their destruction or misuse by the inmates.

cell. Each segregation cell is *now* also equipped with radio outlets and the inmates are permitted to listen to the same radio station listened to by the general prison population. There is no television or other recreational facility.

The walls, floors, and ceilings of the cells are of concrete construction. The front of the cell is barred, including a barred door equipped with a tray slot. The tray slot is covered with a flap which is locked closed except when the inmates are fed their breakfast and dinner meals or handcuffed for out-of-cell movements. It is not opened for their bag lunch.

Breakfast and dinner in the AC are the same as for the general population, with a bag (sandwich) lunch served at noon.[10] *All* meals are served in the cells. While it appears that every effort is made to serve hot food as quickly as possible by the use of reheating carts at the AC, problems do arise, but these problems appear to the court to have been exaggerated by the prisoners. This is understandable since they have so few distractive activities that the arrival of a meal counts as a major event and occupies a primary position in the lives of AC inmates. When the repetitiveness of the menu causes prisoners to "burn out" on the fare, the inevitable result is that they often throw their food out of the cells onto the tier floor or at the guard providing the same. Beverages are served from a pitcher with a long spout (more like a garden bucket) that fits between the bars for pouring into the inmate's plastic tumbler. In addition, inmates may purchase food or other items from the canteen, unless this privilege is taken from them for disciplinary reasons. During the past years several of the plaintiffs have had as much as $1,000 in their accounts.

Clothing is the same as for the general prison population, except that the inmates receive only one set of blues each week. When an inmate leaves the AC for a family or other visit he is dressed in a special white outfit (coverall) that differentiates him from the other prisoners and which enables the previously alerted tower guards to follow him as he shuffles along under his out-of-cell restraints. Underwear and sox are changed twice a week on shower days, but there is nothing to preclude an inmate from washing his sox in his cell. Comb, stubbed toothbrush, toothpowder, towel, soap, and toilet paper are issued. Possession of prescription glasses, books, papers, correspondence, legal material, and personal clothing is permitted. Verbal and visual contact, but not physical contact, is allowed with other inmates and with family on the occasion of their visits. Smoking is also permitted.

Inmates occupy their time in their cells as they wish, subject to prison rules. They are confined to their cells 24 hours a day, except for showers, family visits, visits to Adult Authority hearings, hospital visits, court visits, and the meager tier exercise time allotted to them. Correspondence privileges with family, friends, and attorneys are, by prison rules, the same as those of the general population. However, the record in this case shows a number of instances in which the privacy of such correspondence has been violated. Inmates may not leave the cell for academic or vocational purposes and while cell-study courses with individual teachers are available, in practice this privilege has not worked out well and any educational benefits acquired have come from correspondence courses and individual reading. Plaintiffs (except Pinell) have availed themselves of a number of such high school and college level courses. Plaintiffs Talamantez and Johnson completed high school while in segregation. Books and periodicals of all types, except materials which contain a call for violence (Cal.Pen.Code § 2600) or which are legally obscene (Cal.Pen.Code § 311) are permitted. Many of the plaintiffs have large amounts of "revolutionary" literature in their cells. While possession of

---

**10.** Adjustment Center prisoners get only two hot meals a day and a bag lunch whereas mainliners get three hot meals each day.

such material is clearly permissible, plaintiffs in fact get "docked" therefor in their Committee and Adult Authority write-ups.

There is substantial conflict between the prisoners and the correctional authorities on the adequacy of the heating and ventilating system. The evidence indicates that the AC is heated with each cell having a 10″ × 6″ heat and ventilation opening on the rear wall through which the air is circulated. Though the temperature inside the AC is controlled by a thermostat, plaintiffs complain of excessive cold and excessive heat at different times, in part caused by broken windows on the first tier that often remain unrepaired for months.

The cleaning of cells is left to each inmate and the floor of the cell corridor is regularly swept and washed by prison staff.[11] Plaintiffs complain, and the evidence supports their complaints, that the cells, which are without drains, are often flooded by water from broken pipes, stopped up toilets or overflowing basins, as well as by water which cascades from upper tiers. Reasoning that brushes, mops, cleansers and detergents could be converted (and have been converted in the past) into instruments of assault, guards deny (and probably justifiably so) these aids both for flood cleanups and ordinary housekeeping chores.

A female psychiatrist, a physician, a counselor, and a medical paraprofessional are presently assigned to the AC. The custodial staff consists of a program administrator, a unit lieutenant, a sergeant, and twelve correctional officers, two of whom are black and two of whom have Spanish surnames. While officers receive from two to five weeks of instruction in officer training academies, as well as orientation and in-service training at the prison, the court seriously doubts, based on the record in this case, that such training adequately alerts the officers to the sensitivities, dangers, despair, and background of the various groups of inmates. One detects a definite atmosphere of tension between officers and inmates in which hostility, resentment, frustration, despair, and fear predominate as the controlling emotional reactions.

Movement of inmates at the AC, except in emergencies, occurs only during the second watch, from 8 a. m. to 4 p. m. Inmates are permitted to take tier exercise (in the corridor), one prisoner at a time, one hour per day, five days a week. However, in practice it actually works out to less than five days a week and often less than one hour per period. Inmates are *never* permitted any yard or outdoor privileges or exercise whatsoever.[12]

The first tier is separated into four areas, thereby enabling one man to exercise in each tier area at the same time. No search is required prior to exercise. During this exercise period, inmates may pass documents and other things from one person to another, engage in conversation and such recreational activities as chess and dominoes. Most inmates use their tier time for such recreational activities and accomplish their exercise by doing hundreds of pushups and other exercises within their cells.

Hot showers are scheduled twice a week and the time allotted therefor is fifteen minutes. The water is controlled by the guard and some of the plaintiffs have complained that they are not given their full time and often denied their shower privileges. These incidents, if true, are not of constitutional dimensions. Razors and shaving material are made available. Some plaintiffs have complained about forced haircuts and shavings accompanied by acts of violence even during the period of the hearings before this court.

11. Plaintiff Spain testified that there are no rats in the AC.

12. Inmates on the second and third floor of the AC are permitted two and one-half hours of outdoor exercise three times per week in groups numbering up to 17.

Inmates are permitted out of their cells for one family visit per week and for attorney visits without weekly limitation. Plaintiffs average about two attorney visits per week.[13] During these visits they are at all times required to wear the white coveralls and are subject to the mechanical restraints of hand manacles, waistbelt, leg chains, and neck chains. They are strip searched before and after such visits. Cells may be searched while an inmate is out for a visit or showering. Some of these searches have resulted in substantial disarray and even loss of inmate possessions. These searches are aimed at preventing contraband and weapons from being circulated in the cell block. Weapons are often found in this way.

Four cells on the first tier are designated as management cells. They are identical in size to regular cells, but have concrete rather than steel bed bunks. Each has a sink and a seatless toilet as in a regular cell. Each of the management cells is also equipped with a small anteroom which extends 33 inches from the bars to the corridor. The anteroom has a solid steel front, including a solid steel door. Both the door and front wall have windows which can be closed by a steel flap. If the inmate persists in loud noises or the throwing of food or debris or otherwise engages in conduct proscribed by the guards, the door and windows are closed, and the cell becomes a "quiet" cell, which in fact amounts to the equivalent of solitary confinement. The prisoners are not kept in darkness or in the nude. Two cells have only an "oriental" hole-in-the-floor type of waste eliminator and have been called "strip" cells. With no wash basin in the strip cells, drinking and cleaning water must be offered hourly. However, evidence from ex-guards would indicate that this rule is honored more in the breach than in the observance. Presumably, the strip cells

are used only as a last resort, usually in cases where an inmate has destroyed the toilet in his regular cell and repeated that destruction in the management cell. All management and strip cells are illuminated by a 200 watt bulb recessed in the rear wall, much as they are in regular cells. However, the light in these cells is controlled by staff from the maintenance alley behind the cell. The management cells are used only for disciplinary purposes. Inmates confined in management cells or strip cells retain their issued clothing and are given a mattress, blanket, and limited toilet articles.

Prison regulations promulgated by the Director of Corrections authorizes a prison watch commander to transfer an inmate in segregation in the AC to a management cell for unduly disruptive behavior such as loud noises and the throwing of food or debris into the corridor. The length of such confinement is determined by the warden or chief disciplinary officer and a review for release must be made daily.

With the foregoing knowledge of plaintiffs, the causes of their confinement, their subsequent conduct, the nature of the first tier of the AC, and the conditions of confinement therein, the court is in a better position to evaluate the individual claims of plaintiffs and the cumulative impact of those claims.

## THE COURT'S FINDINGS AND CONCLUSIONS

■ Based upon the record in this case, the testimony of the witnesses (particularly that of former Director of Corrections Procunier and that of other correctional officers), the reports that have been made on San Quentin and submitted to the court for its consideration, and the court's own inspection of the AC, it is evident that the continued

13. Plaintiffs were permitted to have their attorneys and experts inspect the AC and review their central, medical, and psychiatric records. Medical examinations and psychiatric interviews by both plaintiffs' and defendants' experts were ordered. The court also permitted plaintiffs to meet with their attorneys in group conferences. More than twenty such conferences were permitted in the course of these proceedings.

segregated confinement of plaintiffs to the first tier of the AC not only militates against reform and rehabilitation of plaintiffs, but is so counterproductive that it instills in them a deeper hatred for and alienation from the society that initially and justly put them there. Plaintiffs live in an atmosphere of fear and apprehension and are confined under degrading conditions without affirmative programs of training or rehabilitation and without possible rewards or incentives from the state which will give them a semblance of hope for their transfer out of the AC. The court comes to the conclusion that the continuous segregation of plaintiffs 24 hours a day, except for meager out-of-cell movements and tier exercise; the denial to plaintiffs of fresh air and regular outdoor exercise and recreation; the unwarranted and cruel use of tear gas to remove plaintiffs from their cells with its consequent dangers of injury to plaintiffs or occupants of nearby cells;[14] and the abhorrent and shocking use of excessive restraints in the combined form of hand manacles, waistbelt, leg chains, and neck chains[15] for *all* of plaintiffs' out-of-prison movements constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.[16]

14. The court rejects defendants' contention that at times the only expedient method of removing a prisoner with safety from his cell is by the use of tear gas or chemical agents such as mace. Defendants have failed to establish any justification for their use based on a reasonable concern for the security of the institution. Tear gas and other chemical agents are dangerous, inflict pain, and can cause permanent injury and even death. They are corporal punishment, and absent clear and present dangers of riotous proportions, can never be justified when used against individual prisoners in their cells. The use of such chemicals in closed places, such as the AC, where the chemicals affect not only the target, but neighboring prisoners as well, imposes punishment upon prisoners who are innocent of even alleged wrongdoing and constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *Landman v. Royster,* 333 F.Supp. 621 (E.D.Va.1971); *Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okl.1974).

15. The use of restraints on prisoners not *actively* posing a threat to the security of the institution imposes a burden on the prisoners not warranted by the interests of the institution. Manacles, shackles, waistbelts, leg and neck chains are painful devices which inflict corporal punishment on those wearing them. They engender pain, humiliation, rage, and resentment to the point where the use of such restraints is counterproductive to any legitimate penal purpose and is destructive to the prisoners. The cruel and unusual character of the punishment resulting from the combined restraints employed was clearly evident from the court room demonstration in the course of the hearings in this case. No possible justification was presented for the use of the neck chain and its use for any purpose whatsoever constitutes cruel and unusual punishment. Subjecting plaintiffs to the combined use of manacles, waistbelt, leg chains, and neck chains during their out-of-cell movements makes it impossible for those restrained to demonstrate that they are capable of handling themselves without them. Nothing can be more degrading and dehumanizing than to force a prisoner to visit his mother or other family member under such restraints.

16. The prohibition against cruel and unusual punishment in the Eighth Amendment is applicable to the State of California through the due process clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). As the Supreme Court noted in *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1957), the words of the Amendment "cruel and unusual" are not precise and their scope is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." As noted in *Holt v. Sarver,* 309 F.Supp. 362, *supra* at 380:

The term cannot be defined with specificity. It is flexible and tends to broaden as society tends to pay more regard to human decency and dignity and becomes, or likes to think that it becomes, more humane. Generally speaking, a punishment that amounts to torture, or that is grossly excessive in proportion to the offense for which it is imposed, or that is inherently unfair, or that is unnecessarily degrading, or that is shocking or disgusting to people of reasonable sensitivity is a "cruel and unusual" punishment. And a punishment that is not inherently cruel and unusual may become so by reason of the manner in which it is inflicted.

■ The First and Sixth Amendment claims of plaintiffs and all other claims not discussed above, namely, the alleged denial of access to effective assistance of counsel, access to the courts, access to the media, invasion of privacy as it relates to plaintiffs' mailing and visiting privileges, lack of medical care and attention, lack of an adequate and nutritious diet, and other alleged repressive measures, whether considered individually or collectively, are not supported by the evidence and are not of such constitutional dimensions as to justify intervention by a federal court. Though the evidence reveals incidents which have resulted in an invasion of plaintiffs' right of privacy in their attorney-client relationship and in their visits with family or friends, no *pattern* emerges which necessitates injunctive relief. It is evident from this very case and the evidence submitted in these proceedings that plaintiffs have had and continue to have effective assistance of counsel and access to the courts. Defendants' regulations and practices governing access to the media do not infringe plaintiffs' First and Fourteenth Amendment freedoms. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Defendants' handling and censorship of the mails meet with the criteria enunciated in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973). The waiting time for family and attorney visitors is too long. However, this situation is improving and further steps for improvement have been taken.

Plaintiffs were found to be in good physical condition following physical examinations by Dr. Kasch and Dr. Oliva and psychiatric evaluations disclosed no psychoses. Findings by plaintiffs' doctors and psychiatrists to the contrary, in the court's view, were clearly controverted or at best constitute a difference of medical opinion. The allegation of improper use of drugs required competent expert testimony and no such testimony was provided by plaintiffs. Some of the plaintiffs have athlete's foot. This is not a medical problem, but rather a matter of personal hygiene.

Although the physical plant of San Quentin's Neumiller Hospital is concededly less than desirable, necessary medical services are provided there and use is also made of outlying hospitals. The hospital has a fully equipped surgical suite with recovery rooms, diagnostic x-ray, a clinical laboratory, and pharmacy services. The medical records, though negligently kept in the past, contain the significant medical information regarding the inmate and improvements in the record keeping process are being instituted.

The diet offered plaintiffs at the AC is nutritionally adequate and reasonably well planned. The morning and evening meals served to inmates in the AC are exactly the same as those offered to the general population. AC inmates also receive a noon meal consisting of a bag lunch—two sandwiches and fresh fruit—served with coffee. Three separate outside evaluations of the AC diet were conducted in response to the action herein: one by the Marin County Department of Public Health, one by the San Francisco Department of Public Health, and a computer study by the University of California Department of Nutritional Sciences. These evaluations showed that national standards of nutrition are being met or exceeded.

With the exception of plaintiffs' claim that they are confined on the first tier of the AC without benefit of due process, all other claims of plaintiffs not herein discussed are clearly without merit and hence are rejected by the court.

While there is evidence in the record to support the claims of plaintiffs that they are confined on the first tier of the AC without benefit of due process, the court does not now pass on these claims since any future disciplinary action taken against these plaintiffs or any other prisoner at San Quentin must conform to the minimum standards set forth by the

Ninth Circuit in *Clutchette v. Procunier,* 497 F.2d 809, *modified* 510 F.2d 613 (9th Cir. 1975), *cert. granted,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975), unless those standards are modified by the Supreme Court.

■ Defendants' vague assertions that plaintiffs are revolutionary, disruptive, destructive, militant, aggressive or violent and their specifically asserted primary claim that plaintiffs *must* be held in the AC until the termination of the Marin County Superior Court trial (on charges as to which they are presumed to be innocent), fail to constitute a rational security related justification for the continued confinement of plaintiffs in the AC.

Therefore, in accordance with the findings of fact and conclusions of law set forth above,

■ It is ordered:

1. That unless within 30 days of actual or constructive notice of the entry of judgment in this case, or within 10 days of the termination of the criminal proceedings against plaintiffs presently being conducted in the Superior Court of the State of California, in and for the County of Marin, whichever occurs first, plaintiffs Johnny Spain, Fleeta Drumgo, Luis Talamantez, David Johnson, and Hugo Pinell are accorded a properly noticed disciplinary hearing with the due process protections prescribed by the Ninth Circuit in *Clutchette v. Procunier,* 497 F.2d 807, as modified in 510 F.2d 613 (9th Cir. 1975), defendants shall release said plaintiffs to the general population of a prison to be selected by the prison authorities;

2. That absent an actual or imminent threat of death or bodily harm or escape, an actual and imminent threat of serious damage to a substantial amount of valuable property, or an actual or incipient riot involving a large number of unconfined inmates, the use of tear gas against inmates constitutes cruel and unusual punishment and defendants and all their successors in office shall immediately and hereafter desist and refrain from the use of tear gas or other harmful chemical agents against plaintiffs except in the above enumerated circumstances;

3. That the use of neck chains constitutes cruel and unusual punishment and defendants and their successors in office shall immediately and hereafter desist and refrain from the use of neck chains against plaintiffs;

4. That the use of other mechanical restraints other than handcuffs constitutes cruel and unusual punishment unless an inmate acts in such a violent or otherwise dangerous manner as to present an actual or imminent threat of bodily harm or escape and defendants and their successors in office shall immediately and hereafter desist and refrain from the use of other mechanical restraints, except handcuffs, against plaintiffs except in the above enumerated circumstances;

5. That the denial of fresh air and regular outdoor exercise and recreation constitutes cruel and unusual punishment and that, weather permitting and absent emergencies occasioned by a riot or other unusual circumstances, defendants and their successors in office shall immediately and hereafter accord plaintiffs the privilege of at least one hour a day of outdoor exercise or recreation for five days a week, or the equivalent thereof upon proper notice, unless such privilege is denied a plaintiff for a period not to exceed ten consecutive days after a noticed disciplinary hearing with appropriate due process protections;

6. That the petition of counsel for plaintiffs for attorneys' fees and costs shall be set for hearing before the court upon the giving of proper notice; and

7. That this court shall retain jurisdiction of this case until the further order of the court.[17]

---

**17.** This suit was not brought as a class action and hence the injunctive relief granted is enforceable only as it applies to the named plaintiffs (Cf. *Board of School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). It is anticipated, however, that defendants will apply the order to the conditions of confinement and treatment of all inmates at the Adjustment Center at San Quentin, thereby obviating the necessity of invoking the continuing jurisdiction of the court to afford relief to such other inmates. Upon proper motion this action could have been readily maintained as a class action for (1) plaintiffs are representative of all inmates at the Adjustment Center at San Quentin; (2) the class is so numerous that joinder of all members was impracticable; (3) there are, as the record clearly indicates, questions of law and fact common to the class; (4) the claims of the plaintiffs are typical of the claims of the class; (5) the plaintiffs have fairly and adequately protected the interests of the class; and (6) the adjudications herein made with respect to the named plaintiffs are as a practical matter dispositive of the interests of all inmates at the Adjustment Center at San Quentin not parties to this litigation. Rule 23(a) and (b)(1), (2), Federal Rules of Civil Procedure.