**Thomas LeGRANDE et al., Plaintiffs,**

v.

**Walter REDMAN et al., Defendants.**

**Civ. A. No. 76–101.**

United States District Court,
D. Delaware.

Dec. 2, 1976.

Thomas LeGrand et al., plaintiffs, pro se.

Keith A. Trostle, Asst. Atty. Gen., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

This is a civil rights action pursuant to 42 U.S.C. § 1983 in which several inmates at the Delaware Correctional Center at Smyrna are challenging the use of tear gas in the maximum security building at the institution. They seek injunctive relief. The named defendants are Walter Redman, the Superintendent of the Institution,[1] Harold Martin, Captain of the guards, Jose Hernandez, a lieutenant, Earl Pope, a lieutenant, and Robert Heller, a guard.

At an earlier stage of the proceedings, this Court held that the plaintiffs have standing to challenge the gassings in issue which both occurred in B–Block despite the fact that they are all residents of C–Block,[2] an adjacent wing of the maximum security building.[3] Class action certification was refused. A trial on the merits has now been held and I conclude that the plaintiffs have not proved that they have been deprived of any constitutional right and, thus, they are not entitled to the injunction they seek.

## FACTUAL FINDINGS

Two separate incidents gave rise to the complaints in these consolidated cases.[4] The inmates and correctional officers are, for the most part, in agreement about what transpired on these two occasions.

On January 27, 1976, Lt. Pope was on "court run" duty. He went onto B–Block to the cell of Mr. Eugene Woodard, an inmate who was scheduled to appear in court for an extradition hearing. He discovered that Woodard had barricaded himself in his cell and was refusing to go to court. Woodard had also armed himself

---

1. At the time of the incidents in question, Mr. Redman was the Assistant Superintendent at Smyrna.

2. B–Block is the most secure section of the maximum security building and is generally used to house inmates who pose serious discipline problems or are high security risks. C–Block is for lesser security risks within maximum security.

3. Memorandum Opinion, August 3, 1976.

4. The events of January 27, 1976 gave rise to the complaint in Civil Action No. 76–96. The events of February 1, 1976 provoked the complaint in Civil Action No. 76–101. These were ordered consolidated prior to trial.

with a weapon fashioned from a razor blade and with a pillow case filled with heavy objects. Pope spent several minutes talking to Woodard trying to convince him to go peacefully. The efforts were to no avail and Pope left the area. A short time later he returned with additional officers. He again urged Woodard to come out of the cell. Woodard became abusive and threatened to injure anyone who tried to remove him. By this time, the cell door had been opened part of the way and an officer sprayed a streamer of gas[5] at Woodard. This was not effective. Conversation continued while the officer in charge of the building left to call the Assistant Superintendent for permission to use a tear gas gun[6] on the inmate. Redman refused permission and recommended instead the use of a "mini-grenade".[7]

After further efforts at persuasion failed, the gas grenade was tossed into the cell. It was immediately ejected and it detonated in the area outside the cell where several officers had gathered. The guards contacted Redman once more and at this point he decided to go to B–Block himself with Captain Martin. When they arrived, Redman and Martin also attempted to talk Woodard into submitting. Martin entered the cell with the hope of disarming the inmate. Woodard swung the heavy bag he had at the Captain's head but missed. Redman instructed Martin to leave the cell and he then sent for the tear gas gun. The Captain went to each cell on the block and offered the inmates an opportunity to leave their cells and go out into the yard before the gas was dispensed. They all refused and they began yelling out encouragement to Woodard. When the tear gas gun arrived Redman gave Woodard one final chance to come out and then he fired a single cartridge of gas into the cell. Woodard exited immediately and was taken to court without any further problems.

Woodard's cell was quickly closed off to prevent excess gas from escaping into the rest of the cellblock. The fire door was opened and fans were set up to blow the gas out of the building. Nevertheless, because of poor ventilation in the maximum security building, gas remained for several hours and the odor lingered for a few days. Although the inmates who requested medical attention to relieve the effects of the gas did not receive it, there is no evidence that anyone suffered serious injury from the gas on that occasion.

February 1, 1976 was the next time that a heavy dose of tear gas was administered. During the evening feeding on B–Block, a fracas erupted between the inmates and the guards. There is a dispute as to how serious the disturbance was but it appears that the inmates verbally harassed Officer Robert Heller and threw food, hot liquids and perhaps other objects at him. Heller used a tear gas streamer on several inmates while he attempted to close the flaps on the cell doors that had been opened to permit the delivery of food. Inmates continued to shout and throw food. One inmate managed to get out of his cell. Lt. Hernandez, the officer in charge on the shift, directed Heller to leave the tier and obtained a canister[8] of tear gas from the nearby security office which he threw out onto the cellblock. B–Block inmates were locked in their cells at the time the gas was released and they remained locked in.

The canister of tear gas landed near the cell of a Mr. Richard Weddington. Mr. Weddington had to be removed to the hospital that night and he is still hospitalized with chemical pneumonia. The institution

---

5. The Superintendent, who has been trained in the use of tear gas, testified that the streamer, an aerosol can of gas, is effective only when sprayed at short range directly into the face of the subject.

6. According to the Superintendent, a single shot tear gas gun disperses a gas powder over a thirty to thirty-five foot area and can be used on an individual or a crowd.

7. The Superintendent testified that the "mini-grenade", a burning agent mixed with gas, is effective when used in a small enclosed area.

8. The Superintendent testified that the canister used was a size appropriate only for outdoor use or for a dire emergency indoors.

doctor testified that the gas may have caused the pneumonia. Since he first became ill with the pneumonia, Mr. Weddington has also suffered a cerebral hemmorhage which, according to the testimony, may have been an indirect result of the pneumonia.

A short time after the canister exploded, the plaintiffs and other inmates from C–Block began to smell the gas and to feel its effects. Most of them were not locked in their cells and several of the plaintiffs canvassed their cellblock to warn other inmates that there had been a gassing and that precautions should be taken. They found two inmates who they claim had passed out. One received oxygen in the institution hospital and was returned to his cell that evening. Inmates administered artificial respiration to the other. That inmate received no further medical attention. Several other residents of C–Block requested permission to go to the institution hospital. They were told that there was no room. There is no evidence that anyone other than Mr. Weddington received serious or lasting injury as a result of the February 1 incident.

A short time after the gassing, the escape alarm sounded and many of the prison guards were called away from their regular posts to assist in the search for the escapee. Those who remained in the maximum security building began efforts to clear the gas from the tiers. In connection with these efforts, the guards instructed the C–Block inmates to lock themselves into their cells so that the fire door could be opened to permit ventilation without creating a risk of further escapes. Because of the concentration of gas in the cellblock and because the cell windows could not be opened to permit fresh air into the cells, the inmates resisted. They asked to be permitted to remain in the television room where there was a supply of fresh air. Lt. Hernandez rejected the proposal for security reasons and the inmates were locked in their cells before fans were set up and the fire door opened. Again, as a result of the poor ventilation system in the building, the gas smell lingered for some time.

A short time after the February 1 incident, the Administration of the institution reviewed the events of that night. They decided that Lt. Hernandez had violated institution regulations for the use of tear gas and that he had overreacted to the situation. As a result, Hernandez was reprimanded and demoted. While still employed by the State, he no longer remains at the Delaware Correctional Center.

It has now been more than nine months since the second tear gassing described here occurred. The plaintiffs did not present any evidence the institution has used gas since that time in any larger doses than the streamer directed at a single individual. Moreover, tear gas has been available to officials in the Delaware Correctional Center since 1952. None of plaintiffs' witnesses, some of whom have been incarcerated in the maximum security wing for four or more years, testified about any other, earlier uses of tear gas. Thus, although the two instances which gave rise to this suit occurred within a week of each other, it appears that resort to tear gas is uncommon at the Delaware Correctional Center.

## LEGAL STANDARDS

Two constitutional rights are implicated in plaintiffs' claims. The first is the right under the Eighth Amendment, incorporated through the Fourteenth Amendment, to be free from cruel and unusual punishment. The second is the right under the Fifth and Fourteenth Amendments to due process of law. In the context of this case, the analysis of the two rights is much the same.

Generally, Eighth Amendment violations take one of two forms. As the Seventh Circuit expressed it in *LaBatt v. Twomey*, 513 F.2d 641, 648 (7 Cir. 1975), plaintiffs who complain of cruel and unusual punishment

. . . must either show that the actions of the defendant intentionally inflicted excessive or grossly severe punishment upon them or that conditions so harsh as to shock the conscience were knowingly maintained.

Here, there was no intentional infliction of punishment, as we usually think of it, upon these plaintiffs. The intended objects of the punishment or control measures were, in the first instance, Woodard and, in the second instance, the inmates of B–Block who were involved in the disturbance which touched off the gassing. The plaintiffs and other residents of maximum security undoubtedly suffered some discomfort as the by-product of the gassings directed at others, but there was no intent to punish them. Accordingly, with respect to the plaintiffs' Eighth Amendment claim, the questions must be whether the general conditions that were created throughout maximum security and that thus affected plaintiffs were such as to "shock the conscience".[9]

The analysis under the Due Process Clause is that drawn from *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and the applicable legal standard is the same. The question posed is whether the official conduct "shocks the conscience". *Davidson v. Dixon*, 386 F.Supp. 482 (D.Del.1974).

## USE OF GAS IN THE INSTITUTION

There can be no dispute that exposure to gas is a painful and unpleasant experience, particularly when it is present in large quantities. For the average, healthy individual, exposure to the gas results in severe irritation of the eyes and throat. It causes a burning sensation in the eyes, tearing and coughing. Those with asthma or other respiratory ailments may find it difficult to breathe. As the Weddington example makes clear and as institution officials conceded, very serious and lasting effects may result from prolonged exposure to high concentrations of tear gas. Given these facts, gas is not appropriate for routine or unrestrained use.

The defendants showed at trial that the institution is aware of the dangers associated with tear gas. The Superintendent has adopted standards governing the use of gas which should be sufficient in most instances to prevent unnecessary use and thereby prevent violations of the rights of those incarcerated under his control. Of course, virtually no safeguard short of an outright ban on the use of gas can eliminate the possibility of an occasional abuse by a correctional officer. Nothing in the record before me would warrant this extreme measure. It should be noted here that tear gas is a substitute for the use of force which carries with it its own risks of serious injury to inmates and to staff members.

Among the safeguards the institution has adopted are restrictions on who may authorize the use of gas, when it may be used and who within the institution has access to it. Moreover, testimony shows that there is restraint in the quantities used and that, when an abuse occurs, disciplinary action follows.

With the exception of the aerosol gas streamer, the use of tear gas may be authorized only by a small "control group", consisting of the Superintendent, the Assistant Superintendent, the Captain and the Executive Lieutenant. Each of them has training in the use and effects of gas. Tear gas containers, other than streamers, are generally not available on the cellblocks. They must be obtained from the central control office when the need arises. Even the small streamers, which are the only means of self-protection the correctional officers ordinarily have access to, are not carried on a regular basis. Officers carry them only when there is an indication that they may meet with trouble. The use of gas is authorized only to protect the life or safety of an inmate or institution employee or to prevent destruction of State property.

On the one occasion about which we have testimony when gas was used in compliance with the regulations, institution personnel showed considerable restraint. They began

---

**9.** Other cases have held that the Eighth Amendment is violated if the conduct was "barbarous", *Sostre v. McGinnis*, 442 F.2d 178, 191 (2nd Cir. 1971), *cert. denied sub nom. Sostre v. Oswald*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), or offensive to the "evolving standards of decency that mark the progress of a maturing society", *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

with the smallest dose of gas available and only after that and the next larger quantity failed to achieve the necessary objective did they use a quantity which would spread beyond a single cell. On February 1, when the building lieutenant used gas without authorization, he was reprimanded and demoted by the Disciplinary Board. Plaintiffs did not show that there has been any other instance of improper use of gas.

Further, the prison administration established that it makes reasonable efforts to mitigate the effect of the gas. On January 27 each inmate had the opportunity to leave the area before gas was dispensed. On both the 27th and the 1st officers attempted to ventilate the building as quickly as possible. Although it does not appear that medical care is widely available after a gassing, I am not convinced that the plaintiffs or anyone other than Richard Weddington required a physician's attention as a result of the incidents described.

## CONCLUSION

Certainly there are circumstances in which tear gas improperly or carelessly used would constitute cruel and unusual punishment or a violation of due process of law. *See Landman v. Royster*, 333 F.Supp. 621, 649 (E.D.Va.1971). This case does not present those circumstances, however. At Smyrna, the use of gas is regulated and precautions have been taken to prevent abuses. Further, the record establishes that, when an abuse does occur, the institution is willing to act to discipline the guilty party. This appears to have deterred further abuse.

With respect to the January 27th gassing, the prison officials acted in a restrained and reasonable manner. On February 1st prison guidelines for the use of gas were violated and the gassing was an overreaction to a disturbance among inmates almost all of whom were locked in their cells. However, that incident standing alone does not "shock the conscience" nor did it so severely effect these plaintiffs that it represents cruel and inhuman treatment. Moreover, the plaintiffs could not point to any other instances

of use of tear gas other than the streamer and .even its use does not appear to be unrestrained. Thus, plaintiffs have not established the threat of irreparable *future* harm which would entitle them to injunctive relief. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *United States v. Oregon State Medical Society*, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).