Johnny L. SPAIN et al.,
Plaintiffs-Appellees,

v.

Raymond K. PROCUNIER et al.,
Defendants-Appellants.

No. 76–1095.

United States Court of Appeals,
Ninth Circuit.

May 30, 1979.

As Amended June 15, 1979.

As Amended on Denial of Rehearing
July 30, 1979.

Sanford Svetcov, Chief Asst. U. S. Atty., San Francisco, Cal., for defendants-appellants.

Fred J. Hiestand, Berkeley, Cal., for plaintiffs-appellees.

Before DUNIWAY and KENNEDY, Circuit Judges, and PALMIERI,* District Judge.

KENNEDY, Circuit Judge:

Six prisoners in the California state prison at San Quentin brought this suit to establish that conditions of their confinement and certain practices directed against them by prison guards were in violation of the cruel and unusual punishment clause of the Constitution. U. S. Const. amend. VIII. The action was commenced in the United States District Court for the Northern District of California against the Director of

---

* Honorable Edmund L. Palmieri, United States District Judge for the Southern District of New York, sitting by designation.

the California Department of Corrections, the Warden and Associate Warden of the prison, and three prison correctional officers. Judge Zirpoli conducted a 29-day trial and made a personal inspection of the prison to determine the facts of the case. He rejected certain major claims of the plaintiffs, but found that their constitutional rights had been violated in significant respects. The trial judge permitted the defendants to correct the deficiencies and allowed them an opportunity to report on their progress, but when these rulings proved inadequate for the protection of the plaintiffs, he issued an injunction ordering certain corrective actions. The order is supported by an extensive opinion, *Spain v. Procunier*, 408 F.Supp. 534 (N.D.Cal.1976). The defendants appeal. We think the opinion should be affirmed in part, and modified or reversed in other respects, all as set forth further below.

The case is difficult because it requires us to pass upon measures adopted by prison officials for the safe custody of some of the most dangerous men in the prison population. Each of these plaintiffs had been either charged or convicted of violent acts while in prison even before an outbreak of further violence on August 21, 1971. On that date, it is alleged, each of the prisoners had responsibility in some degree for crimes in which three prison officers and two inmates were slain. As the trial court stated, "Director Procunier testified that the incident of August 21, 1971 was the worst in his eight years as Director of Corrections." 408 F.Supp. at 538 n.4. The plaintiffs here were jointly indicted for that incident upon various charges depending on their degree of alleged participation, and the indictment contained three counts of murder of correctional officers, two counts of murder of other inmates, one count of conspiracy to escape, kidnap and possess a weapon, and counts of aggravated assault upon three other officers.

The prisoners were assigned to the adjustment center (known as the AC) at San Quentin Prison. The AC is a three-story structure used primarily to segregate and discipline disruptive prisoners. Prison regulations directed a classification committee to determine, after an alleged criminal offense committed by a prisoner in custody had been referred to the district attorney for prosecution, whether the inmate should be segregated from the rest of the prison population during the pendency of the criminal proceedings. The committee had assigned all of these prisoners to the AC. Some of the prisoners had been assigned there prior to the August 21, 1971 incident, and various justifications were offered for their continued detention in that facility, but the trial court found that the August 21, 1971 incident was the principal reason for holding the plaintiffs in the AC continuously from that date to the date of trial.[1] Some of the prisoners had been held in the AC for four and one-half years when this action was commenced. The criminal trial for the August 21, 1971 incident had not been completed at that time.

The living conditions, sanitary facilities, and daily routine in the AC were described in detail by Judge Zirpoli. He concluded there was no serious deficiency concerning the physical structure and that medical, nutritional, and sanitary provisions for the prisoners were adequate. The plaintiffs did not appeal these findings relating to the AC, and they did not appeal findings adverse to them on numerous first and sixth amendment claims, such as alleged denial of access to effective assistance of counsel.

The respects in which the district court found constitutional deficiencies are: the procedure used to assign prisoners to the AC, the use of tear gas, the use of mechanical restraints, including neck chains, and the failure to provide inmates in the AC with any outdoor exercise. The defendants

---

1. Although plaintiffs were assigned to the AC pending their trials on charges stemming from this incident, this opinion is in no way premised on a theory that with respect to those charges the plaintiffs were pretrial detainees. *See Bell v. Wolfish*, —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We rely solely on the eighth amendment in evaluating the plaintiffs' conditions of confinement.

appeal these rulings. After certain preliminary matters, we address each of these subjects below.

## Three-Judge Court

■ Appellants first argue that the district çourt's action required a three-judge court. The former statute, 28 U.S.C. § 2281, which was repealed in 1976, Pub. L.No. 94–381, 90 Stat. 1119, required the convening of a three-judge court to enjoin "the enforcement, operation or execution of any State statute . . . or of an order made by an administrative board or commission acting under State statutes." However, the Supreme Court recognized many years ago that the three-judge court is "a serious drain upon the federal judicial system," *Phillips v. United States*, 312 U.S. 246, 250, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941), and directed that the earlier statute, former 28 U.S.C. § 380, upon which section 2281 was based, be narrowly construed, *id.* at 250–51, 61 S.Ct. 480. In *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Supreme Court held that a complaint does not meet the threshold requirements of section 2281 jurisdiction and therefore does not necessitate a three-judge court if it does "not mention or challenge any rule or regulation of the Authority; nor [does] it seek an injunction against the enforcement of any identified rule." *Id.* at 313 n.2, 96 S.Ct. at 1555 n.2. *See Morales v. Turman*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977) (per curiam); *Costello v. Wainwright*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977) (per curiam). In this case, the complaint did not challenge or seek to enjoin any rule or regulation; all that was challenged were the practices of appellants as directed toward the plaintiffs. In *Morales v. Turman, supra*, the Court specifically held that constitutional challenges to "generalized, unwritten practices of administration" do not require a three-judge court. 430 U.S. at 323, 97 S.Ct. at 1190. Therefore, the case did not require a three-judge district court.

## Procedural Rights

The trial court ordered that unless the appellees were "accorded a properly noticed disciplinary hearing with the due process protections prescribed by the Ninth Circuit in *Clutchette v. Procunier*, 497 F.2d 809, as modified in 510 F.2d 613 (9th Cir. 1975), [*rev'd sub nom. Enomoto v. Clutchette*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), vacated in part, ·536 F.2d 305 (9th Cir. 1976)]" they were to be released from the AC and permitted to rejoin the general population of the prison. 408 F.Supp. at 547. We reverse and remand this order for reconsideration in light of the Supreme Court decisions in *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 444, 46 L.Ed.2d 384 (1976). *See Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978).

## Tear Gas

The plaintiffs sought to prohibit prison personnel from using tear gas against them. It was alleged that this painful substance was used to remove recalcitrant prisoners from their cells and that the use of the chemical caused anguish to prisoners in adjacent cells even if they were not the ones refusing to cooperate with prison officials.

■ The principal position taken by the state, both on this question and as to all other substantive matters raised in the appeal, is that federal judicial interference in prison management is not justified on the facts of this case. The federal courts should use great restraint before issuing orders based on the finding that the state has followed unlawful procedures in discharging the unenviable task of keeping dangerous men in safe custody under humane conditions. This said, it must also be remembered that enforcement of the eighth amendment is not always consistent with allowing complete deference to all administrative determinations by prison officials. Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right

to unionize), the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes. Eighth amendment protections are not forfeited by one's prior acts. Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established. *See Bell v. Wolfish,* —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Newman v. Alabama,* 559 F.2d 283, 286 (5th Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Williams v. Edwards,* 547 F.2d 1206, 1211–12 (5th Cir. 1977); *Inmates of Attica Correctional Facility v. Rockefeller,* 453 F.2d 12, 22–23 (2d Cir. 1971). In this regard we recognize that an equitable decree should not go further than necessary to eliminate the particular constitutional violation which prompted judicial intervention in the first instance. *See, e. g., Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). This case involves no undertaking to change major correctional policies, but it is rather an evaluation of a claim that the state has followed unlawful procedures in some aspects of its day-to-day treatment of these particular prisoners. The trial court made it clear that its orders, both as to tear gas and as to all other relief granted, pertained only to the state's treatment of the named plaintiffs in this case. Federal intervention was thereby limited. We must recognize, however, that if the court has imposed these restraints on the handling of the most dangerous men in the system, its decision will inevitably be viewed as an important precedent for setting standards of treatment for inmates in most other circumstances.

We examine the court's order restricting the use of tear gas with these principles in mind. There was some evidence in the record that one prisoner had died from tear gas inhalation in the prison, Transcript vol. 10 at 851, but the trial court made no findings as to that incident. The court also did not make findings as to the dates or number of times in which tear gas had been used improperly against the plaintiffs, but the defendants acknowledge occasional use of tear gas to remove these prisoners from their cells when they were recalcitrant.

The trial court focused its attention on technical testimony concerning the properties and physiological effects of tear gas. An expert in pharmacology testified on these matters. He explained that tear gas can be lethal in the confines of a small cell, such as in the adjustment center. The amount of tear gas used and the extent of exposure are critical factors in measuring the dangers of this weapon. Tear gas in the AC was dispensed from either a tear gas billy or a dust projector. The billy contained well below a lethal dose, even when used in a confined area. The dust projector, however, contained what appellants admitted is close to a lethal dose. The district judge concluded that

> [t]ear gas and other chemical agents are dangerous, inflict pain, and can cause permanent injury and even death. . . The use of such chemicals in closed places, such as the AC, where the chemicals affect not only the target, but neighboring prisoners as well, imposes punishment upon prisoners who are innocent of even alleged wrongdoing . . . . .

408 F.Supp. at 545 n.14. The district court enjoined state prison officials from using tear gas, against these plaintiffs, unless there is an "actual or imminent threat of death or bodily harm or escape, an actual or imminent threat of serious damage to a substantial amount of valuable property, or an actual or incipient riot involving a large number of unconfined inmates." 408 F.Supp. at 547. For the reasons discussed below we think this part of the district court's order should be vacated and remanded.

■■ The state argues that federal intervention on the subject is not justified,

but evidence supports the trial court's finding that the defendants made unwarranted use of this painful and dangerous substance as a matter of practice, and under that finding we think a constitutional violation has been established. The parties advance contrary contentions concerning the standard imposed by the district court for future tear gas use, the plaintiffs defending the court's use of an immediate danger test and the state arguing for a more flexible test that permits use of the substance where there is a reasonable probability of danger. We think both arguments lack a necessary predicate since neither is related to the amount of the substance or extent of exposure. Neither the court's findings nor the record establishes that the substance is dangerous in every quantity. In those circumstances in which, given the probable extent of exposure, the quantity used is dangerous, then the conditions for its use set forth by the district court are necessary to implement eighth amendment protections. The infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense which permits one to do harm to another person who threatens unlawfully to do an equal or greater harm to another. *See R. Perkins, Criminal Law* 995 (1969). Inherent in the doctrine of self defense is the concept of proportion. If then the tear gas is used in dangerous quantities, we agree with the district court that its use is justified only in those grave circumstances which would justify the use of severe and potentially lethal force.

We think the record further indicates, however, that use of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required. In these circumstances the substance may be a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel. We infer that the trial court was concerned that even if tear gas might legitimately be used in small quantities for this purpose, there might be a temptation, from a desire to punish a particular group or segment of inmates, to cause discomfort to prisoners who occupy adjacent cells. We share that concern and do not sanction the use of tear gas as punishment, but in our view the order should be modified in certain respects.

Use of tear gas has been sanctioned by other courts, *see Bethea v. Crouse*, 417 F.2d 504, 509 (10th Cir. 1969); *Landman v. Peyton*, 370 F.2d 135, 138 n.2 (4th Cir. 1966), *cert. denied*, 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967); *Washington v. Anderson*, 387 F.Supp. 412, 414 (E.D.Okl.1974); *Collins v. Schoonfield*, 363 F.Supp. 1152, 1164–65 (D.Md.1973); *Poindexter v. Woodson*, 357 F.Supp. 443, 456 (D.Kan.1973), *aff'd* 510 F.2d 464 (10th Cir.), *cert. denied*, 423 U.S. 846, 96 S.Ct. 85, 46 L.Ed.2d 68 (1975); *cf. Commission on Accreditation for Corrections, Manual of Standards for Adult Correctional Institutions*, § 4165 at 32 (1977) ("Chemical agents should be used only at the direction of the chief executive officer or delegated subordinate"), but after an examination of those cases we think it fair to say that those holdings were not shaped or formed by expert testimony such as that presented in this case. Those courts did not consider evidence, such as that presented to the trial court in this case, that use of the substance can be extremely dangerous. For example, in *Bethea v. Crouse, supra*, the court without any analysis of the effects of tear gas simply asserted that it was "a purely disciplinary measure" and that "no reasonable man would say that it [the use of tear gas] amounted to cruel and unusual punishment." 417 F.2d at 509. And in *Landman v. Peyton*, 370 F.2d at 138 n.3, the court specifically noted that it was not presented any evidence concerning possible complications from overexposure to tear gas and strongly implied that such evidence might have affected its decision. A number of other courts have, however, condemned the use of tear gas in particular circumstances as violative of the eighth amendment or of due process or both. *See, e.g., Greear v. Loving*, 538 F.2d 578, 579–80

(4th Cir. 1976); *Morris v. Travisono*, 528 F.2d 856, 858–59 (1st Cir. 1976); *Patterson v. MacDougall*, 506 F.2d 1, 3, 5 (5th Cir. 1975); *McCargo v. Mister*, 462 F.Supp. 813, 818–19 (D.Md.1978); *LeGrande v. Redman*, 423 F.Supp. 524, 526–28 (D.Del.1976); *Battle v. Anderson*, 376 F.Supp. 402, 423, 433–34 (E.D.Okl.1974); *Morales v. Turman*, 364 F.Supp. 166, 170, 173–74, 176 (E.D.Tex.1973) (preliminary injunction), *granting permanent injunctive relief*, 383 F.Supp. 53, 73–74, 77 (E.D.Tex.1974), *rev'd on other grounds*, 535 F.2d 864 (5th Cir. 1976), *rev'd*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), *remanded on other grounds*, 562 F.2d 993 (5th Cir. 1977).

■ We think it makes little sense to say that use of tear gas can never be a violation of the eighth amendment. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court stated the eighth amendment prohibits those punishments which "are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,'" *id.* at 102, 97 S.Ct. at 290 (*quoting Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)), or which "'involve the unnecessary and wanton infliction of pain,'" 429 U.S. at 103, 97 S.Ct. at 290 (*quoting Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). We agree with the trial court that use of potentially dangerous quantities of the substance is justified only under narrowly defined circumstances, but we further conclude that use of nondangerous quantities of the substance in order to prevent a perceived future danger does not violate "evolving standards of decency" or constitute an "unnecessary and wanton infliction of pain." Therefore, where there are safeguards to insure that tear gas is not used in dangerous quantities we think its use can be justified in situations which are reasonably likely to result in injury to persons or a substantial amount of valuable property, and that use of potentially dangerous quantities is appropriately reserved for the circumstances narrowly defined by the district court in its opinion. We therefore remand to the district court for determination of appropriate standards concerning dosage level and manner of use to delineate between dangerous and nondangerous use of the chemical. In addition, we request the court to formulate a standard consistent with this opinion so that tear gas may be used in nondangerous quantities if no more convenient or safe control method is available and if feasible steps are taken to protect nonrecalcitrant inmates. In so doing, the court may take into account but is not limited to prison regulations on the use of tear gas. *See* 15 *Cal.Admin.Code* § 3277.

## Mechanical Restraints

During their 4½ years of confinement in the AC, the prisoners were required or permitted to leave that facility for appointments either within the prison, such as the visitors' area, or outside prison confines, such as for court proceedings. Whether their destinations were in the prison or outside it, the plaintiffs were not allowed to leave the AC unless they were restrained by all of these devices: handcuffs; a waist chain or belt to which the cuffs were attached by a chain, hands in front of the prisoner; leg manacles, consisting of loops around each ankle connected by a chain; and a neck chain, consisting of a chain attached to the back of the waist chain and extending over one shoulder, across the neck, over the other shoulder and down the back. The neck chain could be pulled from the back to restrain or control a prisoner. Pain and sores resulted from the shackles being attached too tightly. While the prisoners remained outside of the AC, these restraining devices, including a neck chain, remained fastened for all out-of-cell movements and throughout visits with family, friends, or counsel, but, apparently, not during court proceedings.

The trial court found that use of these devices for all out-of-cell movements was dehumanizing, and that it was cruel and unusual punishment. After a period in which the state was given an opportunity to develop some measures to ameliorate the various conditions the court found violative of minimum standards imposed by the Con-

stitution, the court granted injunctive relief prohibiting the use of neck chains on the plaintiffs under any circumstances and limiting the use of other restraining devices, stating as follows:

> [T]he use of other mechanical restraints other than handcuffs constitutes cruel and unusual punishment unless an inmate acts in such a violent or otherwise dangerous manner as to present an actual or imminent threat of bodily harm or escape and defendants and their successors in office shall immediately and hereafter desist and refrain from the use of other mechanical restraints, except handcuffs, against plaintiffs except in the above enumerated circumstances . ..

408 F.Supp. at 547.

At the outset, we note the court did not find that any of the defendants put mechanical restraints on the prisoners with the intent to punish them by reason of alleged past crimes against other guards and inmates, although the possible existence of this motive to punish is troubling to us, as it may have been to the district court. An intent to punish may be one element in deciding whether there has been an eighth amendment violation, since the state of mind or purpose of a government official bears on the question of whether imposition of the punishment is a necessary or rational means to a permissible end. However, wrongful intent is not a necessary element for an eighth amendment violation. If the physical or mental pain that results is cruel and unusual, it is a violation of the eighth amendment regardless of the intent or purpose of those who inflict it. Here the trial court found a violation of the eighth amendment because the restraints imposed on the prisoners during out-of-cell movements were excessive, painful, and degrading. The record supports that finding. We think, however, the remedy ordered by the court should be modified in certain respects.

We affirm the order that defendants cease using neck chains on the plaintiffs while they remain within the prison. We do not say that use of a neck chain is always cruel and unusual punishment. The necessity for subjecting a prisoner to a painful device is one measure of its cruelty, *see Furman v. Georgia*, 408 U.S. 238, 279, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring), and the record here discloses that even if a prisoner is manacled hand and foot, it may be possible for him to lunge out and cause serious injury to other persons. In this case we think the trial court's order prohibiting use of neck chains was justified, not because neck chains are in themselves always cruel, but because their use on these plaintiffs for more than a 4½ year period was. While the defendants could point to some isolated instances of anger and threats of imminent violence from some of the prisoners, the state did not show that neck chains were necessary for every plaintiff throughout the long period covered by this case. And there appears to be no justification at all for requiring the prisoners to bear the visible burdens of neck chains during all visits to family, friends, and counsel throughout this long period.

The order was directed only to these plaintiffs. The state can seek modification of the injunction if circumstances occur which would make it appear necessary to reinstitute use of this particularly painful restraining device, although that is unlikely in view of a newly adopted regulation discussed below. We therefore affirm the portion of the court's order relating to use of neck chains for the plaintiffs' movements inside the confines of the prisons.

We would be reluctant to say that, given the violent history of these prisoners and the severity of the sentences they face, use of neck chains for the purpose of preventing escape when the prisoners are being transported outside the prison confines is to be prohibited regardless of the prevailing disposition or behavior of the prisoner. It appears, however, that the regulation discussed below now prohibits use of neck chains even for out-of-prison movements. Therefore we think it will be sufficient protection for the plaintiffs for the court to issue as to this aspect of the case an injunction requiring the state to follow its now existing regulation as to these prisoners.

■ As to the portion of the order reached by the court pertaining to mechanical restraints such as waist chains and manacles, we find some difficulties in its interpretation. Aside from the use of neck chains, which was altogether prohibited, use of mechanical restraints other than handcuffs was prohibited "unless an inmate acts in such a violent or otherwise dangerous manner as to present an actual or imminent threat of bodily harm or escape." 408 F.Supp. at 547. Under one interpretation, since some or all of these plaintiffs were accused of killing three guards and two inmates, their past conduct would justify one in concluding that they presented an actual and imminent threat of future violence for so long as they remained in custody with substantial time yet to serve. Under another interpretation, the restraints could not be imposed until the very moment the inmate attempted a further violent and dangerous act, in which case it is plain the restraint would be fixed too late. The problem of interpretation becomes especially significant with respect to movements outside the prison confines. Mechanical restraints are no less painful or degrading when used on prisoners taken outside the prison; in fact they may be more degrading since the prisoner is exposed to the general population, who are far less accustomed to seeing prisoners. The presence of the shackles may confirm their worst beliefs about felons. Nonetheless, the dangers presented when the prisoner travels outside the prison are significant. The closed environment of a prison permits monitoring of most activities of the prisoners and those with whom they are in close contact. This same degree of control is simply not possible beyond penitentiary walls. The movement of prisoners outside the prison inherently presents a serious threat to their guards and the population at large. Under these circumstances, we do not consider that use of mechanical restraints such as leg manacles or waist chains, in addition to handcuffs, is excessive or unreasonable.

■ After the trial court issued the injunctive orders in this case, the Department of Corrections revised its regulations pertaining to mechanical restraints. The regulation states as follows:

Mechanical Restraint. (a) Mechanical means of physically restraining an inmate or parolee will be used only when reasonably necessary under the following circumstances:

(1) In transportation.

(2) Where the past history and present behavior or apparent emotional state of the inmate or parolee, or other present conditions that provide a strong motivation to the inmate or parolee to engage in violence or escape, create a reasonable likelihood that bodily injury to any person or escape will otherwise occur.

(3) Under medical advice to prevent the inmate or parolee from suicide or self-inflicted serious physical injury.

(b) Mechanical means of physical restraint will not be used as punishment. No mechanical restraint equipment or device will be placed about the neck of an inmate or parolee, nor will restraint equipment be applied in any way so as to inflict physical pain, undue physical discomfort, or to restrict blood circulation or breathing. Restraint equipment will not be used to secure an inmate or parolee to a stationary object except as a temporary emergency measure. During transportation an inmate or parolee will not be secured by any keyed locking device or equipment to any part of the transporting vehicle.

(c) When mechanical restraint is required, handcuffs, alone or attached to a waist chain, will be the usual method used. Additional mechanical restraint, such as leg irons, additional chains or other specialized restraint equipment, is permitted only where it reasonably appears that individual circumstances exist which justify the use of such additional equipment. The individual circumstances justifying the additional mechanical restraint will be documented except in cases where an inmate is being transported outside the institution.

15 *Cal.Admin.Code* § 3280. We think the regulation is a sensitive statement, which gives compass to those factors that should inform any reasonable assessment of whether or not prisoners should be subjected to undue discomfort or humiliation caused by the restraints. We think it is proper to defer to the expertise of the Department of Corrections by adopting these regulations as the standard for imposing mechanical restraints, as to these plaintiffs. The purpose of protecting the plaintiffs against a recurrence of instances where excessive restraints are imposed will be adequately served with adequacy by enjoining the defendants to follow the regulation set out above as to each of these plaintiffs. This will provide the plaintiffs with a ready means for challenging any perceived violation of their constitutional rights and eliminates the requirement that officials follow different policies as to these prisoners than with the general prison population. Moreover, the modification eliminates problems of interpretation and application that we have found in the order issued by the district court.

*Outdoor Exercise*

The final matter to be considered is the denial of any outdoor exercise to the plaintiffs. The trial court found that for recreation the plaintiffs were permitted to exercise one at a time in a corridor fronting on eight or nine cells. Exercise periods were set for one hour a day, five days a week, but in practice the exercise times were often far shorter than one hour and less frequent than five days a week. During exercise, inmates were permitted to converse with prisoners in adjacent cells and to play chess or dominoes. Inmates on the first floor of the AC were never permitted any outdoor exercise or recreation.

■ The court found "[t]hat the denial of fresh air and regular outdoor exercise and recreation constitutes cruel and unusual punishment," 408 F.Supp. at 547, and ordered defendants to accord plaintiffs the right of outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs

made that impossible. We affirm that order. In so doing, we do not consider it necessary to decide whether deprivation of outdoor exercise is a per se violation of the eighth amendment. Our ruling, and that of the district court, applies to these plaintiffs who were assigned to the AC for a period of years.

There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates. *Frazier v. Ward*, 426 F.Supp. 1354, 1367–69 (N.D.N.Y.1977); *Rhem v. Malcolm*, 389 F.Supp. 964, 972 (S.D.N.Y.), *aff'd on other grounds*, 527 F.2d 1041 (2d Cir. 1975); *Hamilton v. Landrieu*, 351 F.Supp. 549, 550 (E.D.La.1972); *Taylor v. Sterrett*, 344 F.Supp. 411, 420 (N.D.Tex. 1972), *modified on other grounds*, 499 F.2d 367 (5th Cir. 1974); *Conklin v. Hancock*, 334 F.Supp. 1119, 1122 (D.N.H.1971); *Sinclair v. Henderson*, 331 F.Supp. 1123, 1129–31 (E.D. La.1971); *Jones v. Wittenberg*, 330 F.Supp. 707, 717 (N.D.Ohio 1971), *aff'd. sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *see also, Smith v. Sullivan*, 553 F.2d 373, 379 (5th Cir. 1977).

Judge Zirpoli made an exhaustive examination of all of the conditions to which plaintiffs were subjected and quite properly considered not only the "individual claims of plaintiffs [but also] . . . the cumulative impact of those claims." 408 F.Supp. at 544. Several factors combined to make outdoor exercise a necessity. AC prisoners were in continuous segregation, spending virtually 24 hours every day in their cells with only meager out-of-cell movements and corridor exercise. Their contact with other persons was minimal. The district court found that "[p]laintiffs live in an atmosphere of fear and apprehension and are confined under degrading conditions without affirmative programs of training or rehabilitation and without possible rewards or incentives from the state which will give them a semblance of hope for their transfer out of the AC." *Id.* at 545.

The state argues that outdoor exercise was withheld to protect prison staff and other inmates from violent attacks by the plaintiffs, and to protect plaintiffs from attacks by other inmates. The state also cites the objective of reducing the risk of escape, a risk which existed with the plaintiffs even under conditions where security was greater than in the prison exercise yard. These concerns justify not permitting plaintiffs to mingle with the general prison population but do not explain why other exercise arrangements were not made. The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment. Confinement to the AC was not a temporary assignment for these prisoners, and the state has failed to give an adequate justification for failing to provide resources for outdoor exercise during their long period of confinement. In light of all of the conditions existing in the AC, it was cruel and unusual punishment for a prisoner to be confined for a period of years without opportunity to go outside except for occasional court appearances, attorney interviews, and hospital appointments. In 1975 defendants initiated a program of outdoor exercise for AC inmates. The apparent success of this program weakens any claims of impossibility to comply with the trial court's order.

On this record the district court did not find that exercise is required for every prisoner given a temporary assignment to the AC for disciplinary purposes, and we do not address that question. The district court found that outdoor exercise was required for these plaintiffs who were confined to the AC for more than four years. We affirm that order and agree with the district court that it will serve an important purpose if its pendency will cause the state to reexamine its exercise policy as to all persons assigned to this facility.

In a significant number of criminal cases, such as where the defendant pleads guilty or is relatively certain the state can prove criminal guilt beyond a reasonable doubt, his principal concerns are the sentence and conditions of confinement, not a trial to determine guilt or innocence. Yet, by contrast with our determined, even zealous, efforts to shape and refine the adjudication process, courts have given little attention to the elementary requirements of the penal system until recent years. In this case most of the prison practices challenged by the prisoners including provisions for food, medical care, and physical facilities, withstood challenge. *Compare Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977); *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974); *Inmates of Attica Correctional Facility v. Rockefeller,* 453 F.2d 12 (2d Cir. 1971). In part because these basic programs were sound, the trial court was in a position to properly focus its inquiry on certain specific aspects of the treatment in the adjustment center.

Underlying the eighth amendment is a fundamental premise that prisoners are not to be treated as less than human beings. *Furman v. Georgia,* 408 U.S. 238, 271–73, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J. concurring). The amendment is phrased in general terms rather than specific ones so that while the underlying principle remains constant in its essentials, the precise standards by which we measure compliance with it do not. *See Weems v. United States,* 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910). It follows that when confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, the court's judgment must be informed by current and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners. We think the district court gave proper recognition to this principle in its order requiring outdoor exercise for these plaintiffs.

The case is remanded for further proceedings consistent with this opinion.